Good morning, Your Honors. May it please the Court, my name is Dan Conklin. I'm here today on behalf of Victor Santos, a native of Honduras, and the appellant in this case. And, Your Honors, if I may, I'd like to reserve two minutes for rebuttal. Okay, that's two of the nine? Nine minutes. Okay. Your Honors, this case concerns the immigration detention of aliens who are placed in reinstatement proceedings. Well, we know the issue. Yeah, we do know that. We really do take time to read these. What issues are you going to deal with? There's two distinct issues here, the statutory authority for the detention of these aliens, as well as the constitutional limitations on that authority. So I'll be addressing the first issue, the statutory source of authority, and my counsel from Amicus ACLU will be addressing that. Who's going to address the mootness issue? I'll address the mootness issue, Your Honor. You might want to start there. Okay. Your Honor, regarding mootness, I think DEOP really answers that question. Because in DEOP, the alien had also been released and also had his habeas petition pending. And the court determined that it was not moot because it was capable of repetition, the detention. You're saying basically that they're not going to try to detain him again. Isn't that correct? It's all in his hands, whether he violates the conditions of release, right? They're saying currently in these circumstances, they're not going to detain him. But in DEOP, the alien there had already succeeded in his claim for relief, and yet still the court determined that it was not moot because there were circumstances. Isn't there a difference between DEOP? And besides the question of whether DEOP is actually in tension with Civitas, the Supreme Court case from 2001, but in DEOP and here, isn't there a significant factual difference as to who controls the release? In other words, it sounded like DEOP was discretionary. They could bring him back if they wanted to, could they not? Yes, and this release is also discretionary. In what way? By the regulations. But it was released under, according to the government, the same regulations that the Supreme Court previously considered. I believe it was in Clark. And they also noted that release under those regulations was discretionary. Did it say 31412? Was that the word? Yes, and I believe the regulation says for any, it's phrased very broadly. The circumstances indicate release is not appropriate. It's pretty open. It is. And the circumstances of, as Mr. Santos' case demonstrates, could change at any minute. So, by which I mean we're currently waiting a decision from the Board of Immigration Appeals. We don't know how the government would react if he received an adverse decision from the Board of Immigration Appeals. Although one can surmise, just based on news events of this week, the government is saying that it has no intention of bringing him back in, absent a violation of the terms of release. And there's nothing indicating otherwise, is there? Well, it's the government who bears the heavy burden in this case, Your Honor, to demonstrate that there's no reasonable circumstances that could result in Mr. Santos' detention again under similar circumstances. But isn't what they're telling us, in effect, as officers of the court, that we have no intention of bringing him back into custody, absent a violation by him of the terms of release? Well, and that raises another important issue. Absent the terms of release, the relief we're seeking here could result in different terms of release, less burdensome terms of release. There's an immigration judge in a bond hearing conducted by a neutral arbiter who might not necessarily impose the same conditions that ICE has imposed on Mr. Santos. So there are currently limitations on his freedom that an immigration judge may not necessarily impose. I think in Rodriguez they pointed out that this is a distinct form of relief. The right to a bond hearing is not synonymous with the discretionary. Where does this stand now? The asylum, the hearing officer, I guess, the asylum hearing officer, found he had a credible or reasonably credible fear? Yes, that occurred, that was over two years ago, Your Honor. So he, back in March, I believe, of 2013, was determined to have a reasonable fear. Did that go to the I.J.? And it went to the I.J. His fear-based claim has been through the I.J., through the BIA, up to this court previously. The government moved to remand his fear-based claim previously. We went back to the BIA. We opposed further remand to the immigration judge. And right now we're back before the Board of Immigration Appeals, and a decision there has been pending for nearly six months. And I expect, actually, it could result in another remand, but we don't know yet until the BIA issues their decision. So I think also the new discussion... And you want a bond hearing now? What's that? You want a bond hearing now for your client? We want to establish his right to a bond hearing. Is there any case anywhere where someone who's at liberty gets a bond hearing? I mean, bond hearings are given, in my experience, are given to people that are in custody, not people who are at liberty. Well, Diop, Rodriguez, I believe it was the Supreme Court's case, which I cited in the response to the mootness issue, where that noncitizen was also out of custody at the time his petition was decided. An issue there that was being requested was also the bond hearing. So Diop also sought a bond hearing, and he was out of custody. So I really think when we... I'm sorry, I'm not saying anyone ever asked for it. I'm saying are there cases where people at liberty got bond hearings, where courts have said you have a right to a bond hearing while you're not in custody? I'm not certain if that's ever... If somebody actually has physically gone back into court for the bond hearing? Has any court, any reported decision said to someone who is not in custody, you are now entitled to a bond hearing? Yeah, Diop. I believe this court in Diop. Diop found that the noncitizen in that case was entitled to a bond hearing. And he was out of custody, and he had already obtained the relief we're seeking in this case, in Santos's underlying fear-based case. So you think it's as simple as Diop controls? I do think it's as simple as Diop controls, because I think Diop had... There was even stronger... The possibility of Diop's detention after he had already obtained the relief that Santos is seeking is even stronger than... It was even more unlikely that Diop would be taken back into custody as opposed to... I mean, Diop was clear that 1226C applied. He was. He was also subject to an order of removal, and he was also being detained pending his application. So the issue here is whether it's 1226C or 1231? In turning to that issue, Your Honor, yes, that's also in dispute. And I think that 1226A governs the case for multiple reasons. One, he's in an identical posture as Mr. Diop. He's seeking the same applications for relief before the agency below. In the words of Section 1226, there is a decision pending on whether or not he may be removed to Honduras, the country designated in his removal order. But the fact of removal, they're going to argue the fact of removal is final, and therefore it's not 1226 and 1231. Well, the fact of removal is not, because the relief he seeks is going to have a tremendous impact on whether or not he can or cannot be removed. Withholding of removal, in almost all cases, does kind of what it says. It withholds removal. In this case, it would withhold removal to Honduras. It would not remove him to Canada, Mexico, the sunny island of Cancun. Yeah, there's been no mention of any other feasible destination for Mr. Santos' removal besides Honduras. He's only a citizen of Honduras. There's no other country in the past two and a half years that we've been litigating his claim, his fear-based claim. The government's never mentioned any other potential destination for removal. So really, it seems almost certain that what's at issue in this fear-based claim that he has before the agency is whether or not he's going to remain in the United States. Let me ask this, and I know your time's run out for a while, but if, and I don't know if it's possible or not, if the government were to agree to give you a certain amount of notice, and this has happened informally in other cases, and the relationship generally has been pretty good. Let's say they were agreed to give you seven days' notice or something like that. Their concern's probably going to be that your client will flee the minute you get that notice before he's taken into custody. And at that point, you'd have the right to come in to request bond to take the DEOP issue away if we don't agree with you on DEOP. Would that go to your fundamental request for relief? Would you be satisfied with that? And then you're not going to do it, as I said, because the risk of flight is elevated. Yeah, it's difficult to imagine that they would be willing to do that because it's so far removed from the actual practice of But, Your Honor, I don't think so because I think, as in DEOP, there's a lot of circumstances that could arise in the future that could possibly result in him being placed in detention. Your Honor just mentioned a minute ago that what if they try to move him to, say, Canada or another country, a country bordering Honduras. It's possible, say, four years, somehow there's a travel document issued, and they try to, and, again, he again raises a claim for relief from removal to that country. He needs to have established that if he's detained in those conditions, again, he has a right to a bond hearing to have the condition. Okay. Before a mutual law. Any place where MS-13 is operative would be the same problem. Yeah, that's a transnational organization. That's a very – the Northern Triangle, as they refer to it, is Guatemala, El Salvador, even into Mexico. I think there would be a high risk of persecution in those countries as well. And, in addition, I think that there's another consideration that DEOP discussed regarding the general interest in a situation like this for DEOP and the government officials where it's alleged that their detention practices are unconstitutional, to have that clarified because the government has an interest to make sure that they're detaining people in a constitutional manner. And so that issue is not going to go away. That issue is going to remain for Mr. Santos and many others. So I think that's an added consideration that weighs heavily against mootness. Regarding the statute that governs, in addition to the plain language of 236, I just want to point out again, the other statute at issue, the post-removal statute, commences on one of three specified dates. And one of those dates, the only one relevant here, is when the removal order becomes administratively final. Now, the government has been litigating and securing the dismissal of numerous petitions for review across the country arguing these reinstated orders are not final. I'm going to ask counsel about that. You're not arguing judicial estoppel here. I didn't. You're not arguing that their claim in the other cases, in the Ninth Circuit and the Tenth Circuit, give rise to judicial estoppel. Ortiz Alfaro and Luna Garcia. I hadn't raised that argument, Your Honor. Actually, just yesterday I listened to the government's argument in Ortiz Alfaro, and I wish I had listened to it sooner because then I might have thought to have raised that argument. Well, it's in the opinion. It's in the court's opinion. It's pretty clear from the court's opinion. Yes, that they argued. And they also, like us in those cases, relied on the definition of finality. You know, really, there would be no reason for the government to have taken that position in Ortiz Alfaro, Luna Garcia, if they were going to take the position they're taking here that they're two distinct issues, that somehow the order of removal and the relief from removal are two distinct issues. They could have raised that argument in Ortiz Alfaro and Luna Garcia, and those holdings would become unnecessary because there would be no concerns for preservation of judicial review. But they didn't because the INA only contains one definition of finality. It needs to be consistently across the statute. And I would also point out, just with respect to the post-removal statute at 1231, it sets forth various procedures. So in addition to the havoc it would wreak on the judicial review provisions, because we know that only a final order is subject to judicial review, I'd also just point out that, for example, that statute commands that the government shall remove the alien within 90 days. Well, that procedure is entirely inapplicable at this stage, Chief Mr. Santos. 1231, none of the mechanisms for removal can begin until all the questions surrounding how and in what way his removal order can be executed are answered. Okay, thank you, Mr. Connolly. Can you use this in time for rebuttal? We'll hear from you later. Mr. Balakrishnan, is that even close? That's very close, Your Honor. Thank you, Mr. Balakrishnan. What is it? Balakrishnan. Okay, thank you. Good morning, Your Honors. May it please the Court. Anand Balakrishnan on behalf of the AMICI, American Civil Liberties Union. I want to address two points very briefly. The first relates to the discussion about mootness Your Honors just had, and the second relates to the constitutional issue of unreasonably prolonged detention. On the mootness issue, just two very brief points, which is, first, I think the question came up as to what relief Mr. Santos is seeking from this court. And I think that at the end of the day, the relief that's sought is not a bond hearing at this time, but a bond hearing were he to be re-detained for any reason in the future. I'm glad you said that because that's my concern is if and when he's taken into custody again, and then your relief is to immediately go into court and say, you know, this has to stop, give him a bond hearing. Right? That's to the district court. That's when the issue is engaged. Your Honors are correct. That is the ultimate relief. But, however, the same underlying legal issues would have to be decided now by this court, which is both as to the underlying statutory authority for his detention, as well as to the question of were he to be detained under the post-removal order statute. We're ready for a decision at this point. Right. As Judge Chamberlain said, it's not yet engaged. Your Honor, at the same time, I would point you to the Supreme Court's decision in Clark, which is in footnote three, which the government, nowhere in its submission on the mootness issue even addresses or acknowledges. Because in that case, Clark, in Clark, Mr. Martinez, the petitioner in that case, had, in fact, been released on discretionary release. And the Supreme Court directly addressed the mootness issue and stated, as I think I believe Judge McKee noted, that this regulation is very open-ended. He may be re-detained for any reason. And a bond hearing is an important procedural protection, and a decision was required as to whether he was not. A bond hearing was not the specific relief requested in Clark v. Martinez, but the basic principle was. Clark, the footnote that you referred to, I guess it's note three, said that the person, yes, he was on release, but because he was also subject to the Secretary's discretionary authority to terminate. And this doesn't seem, what we have here, as discretionary. In other words, the control as to whether Mr. Santos stays released is in Mr. Santos' hands. That is, does he violate the terms of release as opposed to on a whim, at the discretion of a governmental authority, he can be brought back? Your Honor, first, the regulation does provide for open-ended discretion to be exercised by the government, which may re-detain him for any reason. The only thing saying otherwise is the government's representations in its response to this Court's request for briefing on mootness. Don't we take that into account? The Court might. However, the government has not so stipulated. And furthermore, even the government's representations do not answer the question. I think Mr. Frisco will be up here shortly. He can handle that pretty well there. I guess your argument is even if he so stipulates, we still have a live case of controversy. You still argue that we have jurisdiction to determine whether the post-removal statute governs this case or not. That's correct, Your Honor. There's still jurisdiction to hear that. It's still a live case as to all of the issues presented. And even then, the government's representation doesn't explain what happens were Mr. Santos to, say, lose before the Board and petition for review before this Court and be granted a stay. There's a number of possibilities. We know their position about that. Their position is if he loses, then he's immediately taken into custody because he should have been into custody pursuant to the post-removal statute. Isn't that their view? That might be their view. However, at the same time, under this Court's decision, in Leslie, depending on the underlying statutory authority for his detention, if he were to petition for review, he would still be entitled to a bond hearing under 1226A. And so there's reasons that the government's current representations don't settle any of the underlying legal issues in this case, and that's the reason that it's not moved. Besides the point that I think this is a quintessential example of voluntary cessation where the government had over two years to come to the determination that Mr. Santos was not a flight risk or danger, and yet for some reason chose to do so after a briefing was submitted to this Court. I think that, as Mr. Conklin has already mentioned, this is also a case that affects a number of other detainees. How long was he actually in custody before he was released? Over two years. Your Honor, that's correct. And during this, and I want to, if Your Honor doesn't have any questions on mootness, just proceed very briefly to the issue that was presented in our amicus brief, which boils down to even if this Court should decide that the post-removal order statute 241A.6 applies to Mr. Santos' case, under this Court's precedent, and beginning with Diop and extending through Chavez-Alvarez, he is nonetheless entitled to a bond hearing because his detention became unreasonably prolonged while he was litigating a bona fide claim for relief. And I don't think that there's any dispute in this case that he presents a bona fide claim for relief. He's been vetted not once, but three times by government. Certainly, you could win the battle or lose the war, because if we were to factor in here the fact that he's now released and therefore the government presumably concludes he's not a risk of flight or a danger to the community and let him go, why they hold on to him for two years. But the flip side of that is it sets up a jurisprudence where it encourages them, rather than doing what they did here and letting him go, keep everybody in because they would consider, well, if we let them go now, the Court's going to say, well, you let him go now. He's obviously not a fear of flight or arrest, so why should we hold on to him? Well, I think, Your Honor, that's actually a very good argument in favor of providing for neutral bond hearings for noncitizens who are detained for prolonged periods of time, because I think the government's release after two years raises the question as to whether detention for that period of time was reasonably related to the underlying purposes of the statute. A bond hearing, in effect, ensures that detention does serve those underlying purposes. And so by affording a bond hearing, the government and the noncitizen both will be able to demonstrate whether detention is necessary or not before a neutral arbiter and avoid the sort of confusion and gamesmanship that might be required. That may be a good policy argument, but Congress has said if the post-removal statute applies, then custody is mandatory, right? Isn't that a pretty clear direction we have from Congress? Subject to Zedivitas, but there's an important distinction between that case here. In that case, there was no obvious termination point. Here, there is an obvious termination point. Your Honor, there's two points. First, the statute that I believe that the government is maintaining, he's detained under 24186, is not a mandatory detention statute. It provides for discretionary detention. It's worded with the discretionary term may as opposed to shall, which was the issue provided in DEOP, which is 236C. So in fact, it's discretionary detention, and the question is whether a bond hearing is required. Well, but if it's in their discretion, then if Congress has said it's in the agency's discretion, what can we do about that? Your Honor, I think that this goes to your second question, which is whether Zedivitas controls this case. And it doesn't because for two reasons, for a number of reasons. I think the first is that Zedivitas concerned a wholly different class of noncitizens, people who are basically at the end of the road. They had no claim for relief. They were essentially waiting. They weren't litigating a bona fide claim for relief, nor were they raising any. They were essentially waiting for the government to remove them, and the government could not do so because of external reasons. And that raised a different constitutional issue, which is that of indefinite detention, which is detention without end, as opposed to what this Court considered in DIOP, which is prolonged detention of a noncitizen who is litigating a good faith claim for relief for removal. And Mr. Santos is, in fact, very similarly situated to Mr. DIOP. He's presenting precisely the same claims for relief. Was DIOP a post-removal case? No, it was not a post-removal case. So this whole case turns on that distinction, does it not? If this is not dictated by the post-removal statute, Mr. Santos wins, and the Congress would seem to be true. Your Honor, I would disagree for the purposes of the claim that we're presenting, which is the prolonged detention claim, which is that the principle that this Court enunciated in DIOP, which was that the Constitution provides a liberty interest in freedom from prolonged detention. There's no difference in that interest whether someone has a prior removal order or not, so long as they are presenting, litigating a claim that they, in fact, might win. Why wouldn't that be Zevitus? I mean, you can argue there's clearly a difference between your claim and Zevitus. The underlying liberty interest analysis is exactly the same, isn't it? No, Your Honor. The liberty interest is different, I think, between Mr. Santos and Mr. Zevitus, because Mr. Zevitus had no claim for a leave for removal. I thought they helped you. Oh, they did. Oh, they did. The softball in turn is a strike. Well, I would ask for the softball to be thrown again, and the second try is, yes, in fact, what Zevitus establishes is that the Due Process Clause provides a liberty interest to all persons, including noncitizens in detention proceedings. And I think, to that extent, yes, it is very helpful for Mr. Santos. Even though it doesn't apply. The underlying due process principle, of course, applies. I think the difference is that the contours of that principle are different in the case of Mr. Santos' claim, where there should be no requirement that Mr. Santos has to demonstrate that his removal is not foreseeable, because it's the wrong test for someone in his position who's litigating a claim for a leave for removal, because if that were the test, he could be detained for years, as he has been, without end, because the government simply says, well, if you should lose his claim at any point, after any amount of time, he would then be able to be deported to Honduras. But that's not this Court's holding in Diop. And is it not clear? I thought it was. Maybe not, because I'm lost in the kabuki dance of the IJ and the BIA. But I thought it was clear that he will not be removed to Honduras, but that's still not determined? Well, he continues to litigate his claims for withholding and cat relief, and has also raised a separate claim that he's entitled for asylum. Those claims have not been decided in a final form, and there's no reason to think it's going to be decided anytime soon either, given how long it's gone on for. He's been out since what, June? Correct. Which was, I think, about two years and four months after he was initially detained and his order reinstated against him. I see my time is up, and I don't know whether it would be helpful for me to walk through any of the further differences or similarities between Zidvaitis, this case, and this Court's previous. We wouldn't know if it would be helpful until we hear it. Okay. So why don't I, I'll take the extra time then. Thanks, Your Honor. So as I explained— Well, I wasn't inviting you to continue by saying that. That was a strike you turned into a softball. I was suggesting that maybe we should hear from Mr. Fresco. Right, okay. Well, thank you, Your Honor, and any further— Some days I just work here. Thank you. I'll save any further clarifications for rebuttal. Okay, thanks. Thank you, Your Honor. Did you lose your time, Primo? What was that? Did you lose your time, or you're going down Mr. Fresco? Co-counsel. Good morning, Your Honor. Ian Fresco for the government. Your Honor, I want to explain the entirety of the context behind the mootness argument because I think it's been vastly represented in a way that's not correct. I'll tell you exactly what happened. This case has changed over the course of the two years procedurally. This case should have been over when it first got to the Third Circuit, but it was remanded due to a procedural defect. When this case came to review for the briefing, we reviewed it, and we said, where is this case right now as we sit? It's in the BIA, and we have no idea. There's a decent chance, like the plaintiffs say, that it could be remanded to the IJ. There's a decent chance it could be sustained and come here, and this court might remand it back to the BIA to the IJ. Correct. And so we said at that point it was unacceptable to keep Mr. Santos in detention. And so we made a representation to the court. Here's the representation. I know this because I've approved this every step of the way, and I am the boss of the Office of Immigration Litigation, so you're getting it from me. Here's what it says. Under that order, ICE will not place Mr. Santos back into detention unless Mr. Santos violates the conditions of his release or the execution of his removal. Execution, meaning we put him on a plane, can be accomplished on an imminent basis, not he lost his BIA case. That doesn't mean that the execution of his removal, if they move for a stay, and this court has recently put in rules about the stay, and we will work with this court with that. No, I want to commend you. Yes, and we're trying to do everything the right way here to make sure that people don't get removed in an improper manner. And so here's what bothers me about this case, Your Honor. We've given him, the plaintiffs correctly pointed out in their mootness letter, that we have the wrong form. We used form I-220-A. We should have used form I-220-B. We've corrected that. Because we referred to 236. Yes, but the way we characterized the form was correct. We just literally used the wrong piece of paper. We've given him the correct form now. What does that mean? If he wins this case and he goes back into 236 detention, you don't have a right to work under 236. You don't have a right to work. If he loses, if this case is mooted out and he accepts the order of supervision we've given him, you have a right to work. So for the next year, two years, however long this case goes, his client would have a right to work. He gets a work permit. He gets a driver's license. He's going to be in Florida. I'm from Florida originally. I know in Florida, when you get the work permit, you get the driver's license. And he will be able to work and drive legally, where if he's working now and driving now, he's doing it illegally. And so what I don't understand is why one, in terms of representing their client and not the issue, would say I want my client to revert back to a status where he cannot work, where he cannot drive. We're obviously concerned about a lot of other cases in the pipeline. I don't trust you. Well, we've made a representation to the court now about when we would remove this individual client and when we would put him back in detention. That representation, as your Honor said, you know, you want us to make. What if he violates one of the conditions? Then you're going to lock him up again. If he violates one of the conditions, that places him in no different posture than in a bond hearing. The bond hearing, the immigration judge, first of all, they could put an actual monetary bond, which hasn't happened here. He's been released for free. So this is very speculative. The only condition that they claimed in their letter that would be somewhat onerous would be that they have to report when they're leaving the state, but they haven't even reported that they're leaving the state. You know, this is a speculative thing of how he's actually being harmed, that he wants to leave the state. So from that perspective, if you violate an IJ condition or an ICE condition, depending on who issues your release, either way, you get reinserted back into custody, your Honor. But don't we have a voluntary cessation problem? I mean, I hear what you're saying. You're saying he's fine now, right? But for two and a half years, he wasn't fine. And they're arguing Santos suffered unnecessarily because he didn't get what he was entitled to, both statutorily and constitutionally. So why don't we have a live case here? Here's why we don't have a live case, Your Honor, because at each step along the proceeding, until the immigration judge issued an order, the second order, there was an imminent of removal, there was a final reinstatement order that could have been executed, and then this case got up to the Third Circuit, and the law had changed, and the Third Circuit remanded it back saying apply the new law to his case, and then the immigration judge issued an opinion which has some potential frailties to it. Interesting phrase. Potential frailties. Well, I mean, we think it's defensible, and we would defend it, but the point is as stewards of trying to do the right thing for the government, we thought that the nature of this case is at least good faith enough that we would release Mr. Santos. If you notice, we did not move to move the case out when we said to the court we would release Mr. Santos. The suggestion of mootness came from the court. We did not. So there's some government conspiracy here. The government conspiracy would have been file the release and ask for the mootness. We didn't do that. We released Mr. Santos. So you want us to decide whether the post-removal statute governs this case or not? What I'm saying is that this – I want to get to that because I want to get to the merits of this, but what I'm saying is this particular decision, if you decide it the way the appellant wanted, hurts Mr. Santos. Well, that's their problem. You're not his lawyer. Okay, well, that's fine, so I'm happy to talk about the merits in that standard, but if we actually are here to decide cases or controversies, this case or controversy for Mr. Santos, has been resolved in a superior manner than in a bond hearing. That's Mr. Santos' case. This is not a class action. This does not represent similarly situated people, but I'm happy to discuss the merits if the court would like to move on to the merits in that context. But to end there, just saying Mr. Santos' case, he himself is in a far better position today than he would be if he wins this case. Now, back to the merits of this. There are three reasons, Your Honor, why his detention is governed under the post-removal statute and not under the pre-removal statute. The first is you look at the statutory language itself. We just compare a very simple language. We have only two statutes to choose from, 1226 and 1231, and 1226 applies pending a decision on whether the alien is to be removed from the United States and 1231 applies when an alien is ordered removed. So both apply? Well, there are a hundred... Because there's inherent tension in the two. Well, then that would be the... let me then get to prong two, which answers that question. If there is an inherent tension, then Chevron deference would apply, and in the Chevron, yes, because then we're in an ambiguous situation, Your Honor, and there are two BIA decisions and three regulations that would govern here that should be deferred to in that situation. The first would be a matter of AW, which is a BIA decision from 25INN Decision 45. Isn't there an important distinction between two statutes that are in tension and an ambiguous statute that would require Chevron deference? Well, I think that the statute that is actually ambiguous is the statute that defines finality, which is the one that the plaintiffs are depending on. It's not either 1226 or 1231. It's AUSC1101A47. That's the one that defines finality, and it talks about the fact that an order is final when it either is finished at the BIA or the person has not chosen to appeal at the BIA. And what the Ninth Circuit and the Tenth Circuit both said is that's true. In this sense, that statute is not very clear because you can't appeal to the BIA in this situation. One question I have is I realize the other case, Guerrero, was now settled. Which one? Guerrero. Guerrero. I think it was supposed to actually be before us in this sitting. Oh, yeah, yeah. It was under 1101A47. You said, your group, that the removal order was final, and yet in Santos you say it's not applicable to the reinstatement context and does not inform the issue. I think the simple way to explain it, and this court has actually explained it in two cases already. The Cozan case, if you go to the Cozan case from 2007, and there's a Shehu case also. So let me give you the sites for both of those unless you don't need them. The Cozan is 549F3-235, and the Shehu is 482F3-652. Both of those describe situations where what's being appealed is not an actual final order removal. It's something different. In Cozan, it was that the person had finished their case. They had relief under the Convention Against Torture, and the government said we now have a diplomatic assurance that this country won't torture you anymore. So that was the order of removal was not being reviewed. It was the diplomatic assurance that was being reviewed, and the court said this is like a final order of removal, and so we can use the same petition for review process. And in Shehu, it was with the Visa Waiver Program, where there were no conventional final order removal, but the court said this is like that. That's what's happening in Ortiz-Alfaro and in Luna, and that's how we reconcile all of this, which is what's coming to the court at the end of all of these proceedings, which I'm sure it's coming at some point, is a petition for review but not of a final order of removal. It's of a final administrative order from the BIA that is like a final order of removal, but is not a final order of removal. I'm still not sure why that is not inconsistent. Why your argument here is not inconsistent with your arguments in making the 10th Circuit in Ortiz-Alfaro and in Luna Garcia. It isn't inconsistent because I think the court got caught up in the wrong terminology, thinking that you couldn't appeal something if it wasn't called a final order of removal, and that's just not true. That's where everything got caught up. Didn't you say, at least in Ortiz, that there the case wasn't final because there were still proceedings with holdings and contracts going on? Correct, but what we said is it wasn't a final order of the Board of Immigration Appeals, not a final order of removal. That's the difference. The court got caught up in this terminology. This is a judicial versus administrative finality. Correct. A distinction. Correct. Which the other side doesn't necessarily accept. Well, I understand they don't accept it, Your Honor, but when we're looking at what is happening in real life, if the government wanted to waste CHITs with Sweden that we would otherwise use for something else, we could say right now, Sweden, take Mr. Santos, and that could happen, and he'd have no claim. There's nothing he could say about why he can't be deported to Sweden. We just don't want to waste those CHITs because we might need it for someone in Guantanamo or something somebody else, and so that's clearly post-removal detention. We can remove him to any of 190 countries. Has that happened? We have done it with Albanians, sorry, not Albanians, Uyghurs to Albania, to with other people who pose security threats that we want them out, we send them to Nordic countries, but we don't waste the CHITs with someone like Mr. Santos, who obviously we released from detention, but just because we don't waste the CHITs doesn't mean the statute gets interpreted differently. What about your argument that DEOP controls? The argument that DEOP controls, this court has actually dealt with three times, albeit in unpublished decisions, and what the court has said, and I will cite them, which is Aziz v. Attorney General, F-37 Fed Appendix 56, Nunez v. Decker, 480 Fed Appendix 173, and Shalhoub v. Attorney General, 473 Fed Appendix 114, is that in DEOP, if his conviction was not vacated anymore, because what happened was his conviction got vacated, so he was released, if his conviction had been reinstated, the government would have had absolutely no choice, would have had to put him back in detention, and there was a decent chance that his conviction would be reinstated, hence that needed to be decided. Here, we've released Mr. Santos from detention, his release conditions are better because he gets a work permit and a driver's license than what he could get from this lawsuit, and we have given the court the assurances that he will only be detained if he violates the conditions of removal, we literally put these words in very carefully, which I've got to get it back again, or his order of removal can be accomplished on an imminent basis, meaning it's the end of the road, we got you, and in a few days we're going to send you back to Honduras. In this situation, how would the travel papers work? I know this is beyond the confines of this case, but Dennis, I'm going to suggest that you folks just talk, and this may be pertinent to that conversation, the travel documents would be necessary for you to put him on a plane, let's say you decide to spend the trip with Sweden for whatever reason, and send him to Sweden, I assume he then has to apply for the travel documents to Sweden? Yes, we'd have to give him notice, clearly, but we've done this in a matter of weeks, maybe one to two weeks, we give the person the notice, because what we do is we work with Sweden first to make sure this was all in the bag, and then we'd say, okay, now apply for a Swedish visa, and he'd fill out the papers, obviously if he didn't fill out the papers, he's not cooperating with his removal, and then we give the payment for that, but he'd fill out the papers, unless he had some reasonable fear, I mean, he could say, I have a reasonable fear to be sent to Sweden, but if he didn't have a reasonable fear, then once we got that Swedish visa, he can be put on a commercial plane, and sent to Sweden. He could be put on a plane, and that's it. Yes, and then he's, I don't know what he'd be in Sweden, probably not a citizen, but some visa holder in Sweden, but that's where he'd be repatriated, and we have done that in other cases, but we obviously haven't done it in Mr. Santos' case, because we need those chits for more important people, and so that's what's happened here, but again, that doesn't change how you read the statute, that's all still post-removal order, that's all somebody who can be removed immediately, but simply isn't removed. Now, I just want to say one thing with my remaining time, is that Congress, if you look at the third prong of this, and we didn't really touch on it, but if you look at the legislative history, I would ask the court to go to the House Committee Report for IRIRA, which is at 104-469, and Congress talks about how important it is to implement approaches to make deportation more effective, by reducing the likelihood that aliens physically removed from the United States will attempt to re-entry, and one of the methods they talk about is detention, to ensure that these aliens will depart the United States, and so that was the intent, if there's any ambiguity about what the intent was of the Congress here, they wanted detention of people whose removal orders could be executed, and they wanted, that applies with greater force, the people who re-entered after we removed them the first time, that was the purpose of this statute, or one of the purposes. That's pretty clear just from the text of 1231-85, it's pretty clear. Yes, exactly, Your Honor, and so a ruling that undermines that undermines the intent of Congress, doesn't further the intent of Congress to have that, to say that suddenly that person, who, by the way, committed a crime that if we wanted to prosecute, we could put them in prison, that person gets a bond hearing, when most of the time their detention can be accomplished, sorry, their removal can be accomplished quickly, and in cases where it's not, they can file a Zabitaz petition, like we've honored here, and we would release the individual there. So with that, Your Honor, I ask that you deny, or you affirm the district judge's decision and deny the petition for rid of A.B. Escortez. Mr. Fesky. Thank you. Mr. Fesky, you mentioned the position, do you work with Mr. Oswana? What? Do you work with Mr. Oswana? Yes, he's now the head of E.O.R., but his job before he was the head of E.O.R. was my job, so. Okay, all right, because in my regards, Mr. Oswana. Thank you, Your Honors. A couple points. One, I'd point out that every single person who seeks withholding of removal in CAT is technically subject to a final order of removal by the rationale that's being proffered by the government, because everybody has necessarily been ordered removed in order to request withholding of that removal. So D.O.P., by this rationale, also would have had a final order of removal if we're distinguishing between these two forms of relief. How do you deal with the point that Mr. Fresco made at the outset, that he's in a better position now by being released? Because he can work and he can get a license. It's astounding to hear, and I think that if we had Mr. Santos here now and asked him what would he rather have, a driver's license, not a work permit, or have spent the last nearly two and a half years in prison, that's water under the bridge. No, no. Have you asked your client, have you asked your client, do you want a driver's license and a work permit now, or would you rather not have that stuff and have me argue that you were mistreated the last two and a half years? Have you had that discussion? Well, and the last point to make is that that detention, I've spoken to Mr. Santos, and that prospect of detention, having gone through that, is still looming. That prospect of being replaced in those conditions, I do think is... This is not really a 241.412 situation, though, given the, it's more than a representation, the commitment that you have from Mr. Fresco and the Office of Representatives. This is not a Joseph Kaye situation where, for whatever reason, some government employee gets up in the morning and says, let's go get Mr. Santos today. You're not in that situation, which otherwise you might be, under the reg. And speaking of the conditions, you know, just yesterday, Mr. Santos was called and told he needed to, he's at an ICE office right now, given less than 24 hours, and told he needed to be reporting at the local ICE office. Those are the types of conditions where he might not necessarily be subject to those types of restrictions. Well, if he had an individualized bond hearing and he was successful, would he not be subject to that restriction you just noted? Well, we don't know that. It would be a factual determination from the judge that there's a possibility. There's no regulation or anything like that. Those would be standard conditions of release. It's like bail. As far as what the IJ might impose, that doesn't necessarily mean that you have to always have, you know, report within a certain designated period. Under current conditions, is he allowed to violate state law? No, he's not. So if he gets in a car and drives, he just violated his conditions? That's correct, Judge. And if he works, he's violated his conditions? That's correct. So as the government was earlier trumpeting its ability to remove him, because of the system. I don't have to answer for any of you. Make me answer that. So just as we do that, there's numerous circumstances. The government's discussing their ability to remove him to another country. Well, there are always procedures that need to occur before that happens. And so it's not the same time they're saying he could be placed in a removal process in the future. They're also carrying a burden to prove that there's no likelihood whatsoever that this may happen again. At the same time, they're discussing their ability to remove him again in the future. Have you ever seen the Mining Pythons Bureau of Arguments by any chance? I have not, Your Honor. So get it for us or Google it. This is starting to remind me of the Bureau of Arguments. When you see it, you'll know what I mean. Trying to distinguish the removal order from the applications for relief, again, Your Honor's correct that that can't be reconciled with Ortiz, Alfaro, and Luna Garcia, because those distinctions could have been made in those cases and were not. And then regarding congressional intent, I think that's really what this is. Well, forget that for a minute. What about the three NPOs that Mr. Fresco adverted to? Do you agree that we would have to go in a different direction from those three NPOs? I have not read those NPOs, Your Honor, the unpublished decisions that they reference. I don't believe they were included in their briefing either, so I haven't had a chance to see those. But I have a feeling there's certainly more to meet the eye in those decisions. I mean, the risk that you're taking is that if you really push this all the way, that Diop and Leslie and whatever it is, Chavez, Alfaro, although they're precedential, there's a good argument that they really are in tension with Zevitas. And as a result, you would want the logical conclusion would be, okay, let's take it in bank, and then you might end up not getting any longer the benefit of Diop or Leslie or the other case. That doesn't seem like that makes a whole lot of sense, does it? I would say, just real quick, in this case, this person, given these circumstances, who is currently out, and the government is saying they're not bringing him back. And I think, you know, the driver's license, the work permit, he's attempting to succeed. If he wins his claim, he'll have all of those things and much more. Well, so this is the drachulata that you want him to win the withholding of removal? I think he's going to succeed in his withholding claim. But isn't that what you really want in the end? I want him to succeed clearly in his fear-based case and to have a right to a bond here. If he wins his case, he wouldn't necessarily have all of those things, because if he wins his case, he gets a bond hearing. I would like to clarify, as in Diop, really the main remedy we're seeking is if he's re-detained on the road, that he has the right to a bond hearing under any analogous circumstances. That's really the primary remedy we're seeking is that guarantee. If he gets that, he would not necessarily then also get the driver's license or the right to work, just because he got the bond hearing. The hearing officer could just say, as a condition of the bond, couldn't he or she, that you're not going to be eligible for a driver's license. I don't know why they'd say that. The issue with the driver's license varies state to state. So I don't, you know, that's something. In effect, what we're saying is this case, pre-June, brings up your issue. Post-June, back to the point I made at the very outset, it seems like we're not really engaging the issue for this particular individual, who according to the government is actually today better off than he would be had he obtained and was successful with an individualized bond hearing. Well, I don't think that's true, because I think, again, this is Diop, because I think Diop was also released and he had succeeded in his claim and there were still circumstances that could result in his re-detention. He still had an interest in that case, both because he could be re-detained again and also because of the general interest that he has and the government has in this case. It would be much better, we're letting you go, but we could bring you back tomorrow and, you know, it could depend on a change of policy in the administration. Whatever it might be, we could bring you back. That's not where the order reads. And the person who reviewed the order is actually the person in court. You're trying to go to the stop law. That's the stop law. But, again, it's based on the government's order now is based on the current posture of the case, based on the current posture of whether or not they decide they want to use their chips and remove them somewhere else, based on all of these things, which, again, as in Diop, where there were very realistic circumstances that could result in his re-detention, there's realistic circumstances, again, with his fear-based claim. We don't know where that's going to lead. And so I do think it is just – I mean, it's – Well, we know there's so many details in the fear-based claim. We know that that doesn't negate the government's ability to remove him. It just says he can't be moved into Honduras, and you can argue what we talked about before is that any other place where M-13 is operative, it's the same reasonable fear of persecution. He shouldn't go there. But that opens up the door to, I think, Mr. Fresco said 199 other countries. You can even say he's wrong enough to get down to 80 countries. He could still be moved to an awful lot of places. That's not really contested. When that would happen would be contested, and then Zevaitis kicks in. And there's potential destinations of removal, again, that could raise a fear-based claim for him. You know, I don't think every country in the world necessarily would just take Mr. Santos. We know from other litigation in the Zevaitis context, for example, it's not simply that easy to remove people to whichever country. You know, the vast majority of people who succeed in these claims do remain here. Thank you very much.